Alison E. Chase (SBN 226976)
Matthew J. Preusch (SBN 298144)
Christopher L. Springer (SBN 291180)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone (805) 456-1496, Fax (805) 456-1497
achase@kellerrohrback.com
mpreusch@kellerrohrback.com
cspringer@kellerrohrback.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| JARED STARK, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>   v.<br><br>ACTIVEHOURS, INC., D/B/A EARNIN,<br><br>                    Defendant. | No. 19-cv-7553<br><br>**COMPLAINT**<br><br><br>**CLASS ACTION** |

## I.     INTRODUCTION

1.     Defendant Activehours, Inc. d/b/a Earnin ("Activehours" or "Earnin") claims to provide a payday advance with "no fees, interest, or hidden cost."[1] In reality, Earnin seeks to skirt applicable financial, banking, and payday lending regulations through a linguistic trick: calling a payment to use its service a "tip" instead of a cost of borrowing. Semantics aside, Earnin is in the business of loaning money.

2.     Earnin asserts lofty claims – for example, that it is "fighting unfairness in the financial system"[2] – but it fails to disclose to borrowers the true cost of their payday advance. The Earnin app is set to demand from users a default "tip," but that tip usually equates to a very high interest annual

---

[1] Earnin, https://www.earnin.com/
[2] *Id.*

percentage rate (APR). Those tips, moreover, are not prorated or linked to the number of days until an Earnin borrower's payday.  For example, borrowing $100 and paying $5 for it – roughly half of the default – repayable in four days, is effectively a 456% APR. A small $5 tip on a $100 advance payment (repayable 14 days later) is equivalent to a 130% APR. Earnin allows tips up to $14 per $100 borrowed, which may compute to an APR in excess of 700%.

3.     From California, Earnin offers its service nationwide. Earnin makes loans in states where payday loans are illegal, without respect to state usury laws, and in contravention of federal lending laws, such as the Truth in Lending Act. Although it does business in California, Earnin does not comply with the California Financing Law and is not a registered lender, and Earnin does not comply with California's Deferred Deposit Transactions Law and is not a registered lender under that law either. Although Earnin offers loans nationwide, moreover, Earnin does not comply with lending laws – and is not registered to act as a lender – in any of the other 50 states where it does business.

4.     Plaintiff Jared Stark brings this class action Complaint on behalf of himself and all similarly situated Earnin users nationwide in order to correct Earnin's illegal conduct, to recover the fees extracted by Earnin and other damages, and to hold Earnin accountable for misleading and unfair business practices.

## II.     JURISDICTION

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on the federal statutory claims below, and the Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

6.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

COMPLAINT

7.      Earnin's Terms of Service also contains a forum selection provision, which is unlawful, void, and unenforceable under California law.[3] Earnin's forum selection provision is severable from Earnin's Terms of Service under the language of those Terms of Service.[4]

### III.      VENUE

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendant, a substantial portion of the alleged wrongdoing occurred in this District and California, and Defendant has sufficient contacts with this District and California.

9.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District.

### IV.      INTRADISTRICT ASSIGNMENT

10.      This case is properly brought in the San Jose Division of the Northern District of California. Under Local Rule 3-2(c), cases are to be filed in the Division "in which a substantial part of the events or omissions which give rise to the claim occurred."

11.      Defendant Earnin has its principal place of business at 260 Sheridan Ave., Ste. 300, Palo Alto, CA 94306, in Santa Clara County. As Plaintiff alleges that Defendant has engaged in illegal activity through its operation of the Earnin "app", and that such illegal activity is pursuant to a systematic nationwide practice, a substantial part of the events or omissions giving rise to Plaintiff's claims took place at Defendant's offices in Palo Alto.

12.      Thus, pursuant to Local Rule 3-2(e), the proper venue for this case is the San Jose Division of the Northern District of California.

### V.      PARTIES

13.      Plaintiff Jared Stark is a resident and citizen of Leavenworth, Kansas.

14.      Defendant Activehours d/b/a Earnin is a Delaware corporation with its principal place of business in Palo Alto, California.

---

[3] *Id.* at Terms of Service § 17, "Governing Law & Forum for Disputes," *available at* https://www.earnin.com/privacyandterms.

[4] *Id.* at § 18, "Miscellaneous," *available at* https://www.earnin.com/privacyandterms.

COMPLAINT

# VI.   FACTUAL ALLEGATIONS

**A.   The Earnin App**

15.   Earnin was founded by CEO Ram Palaniappan in 2012 as Activehours. Activehours later adopted the name "Earnin."  Activehours is a privately-held, for-profit corporation.

16.   Earnin operates a mobile device application – or "app" – known as Earnin that purports to allow users to draw upon wages before they are paid. Earnin has described its service, variously, as early wage access,[5] a "Cash Out," a "Pay Out,"[6] an "activation," and a "non-recourse liquidity product."[7]

17.   Earnin is part of a proliferation of consumer payday loan products known as "EIA," or "earned income access."[8] Earnin is the largest of such providers. The app is often among the top 10 financial apps in Apple's App Store.[9]

18.   Earnin reportedly has upwards of 10 million app subscribers[10] and has been downloaded more than 12 million times. Earnin claims to monitor more than 15 million hours worked per week among its users, equating to approximately 375,000 active weekly users.[11]

19.   The founder and CEO of Earnin, Ram Palaniappan, was previously the president of Rush Card, a Visa-supported prepaid debit card marketed to groups that have trouble obtaining credit. Comparing the customer bases of Rush Card and Earnin, Palaniappan has identified his customers as being economically vulnerable.[12]

---

[5] *Id.* at: https://www.earnin.com/blog/community-first-finance
[6] *Id.* at: https://help.earnin.com/hc/en-us
[7]  Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them,* NBC News, (July 26, 2019) *available at:* https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071
[8] Dan Quan, *BankThink Don't sideline earned income access,* American Banker, (June 3, 2019), *available at:* https://www.americanbanker.com/opinion/dont-sideline-earned-income-access
[9] Kate Clark, *Earnin raises $125M to help workerstrack and cash out wages in real time,* Tech Crunch, (December 20, 2018), *available at:* https://techcrunch.com/2018/12/20/earnin-raises-125m-to-help-workers-track-and-cash-out-wages-in-real-time/
[10] Farivar, *supra* fn 7.
[11] Clark, *supra* fn 9.
[12] Sramana Mitra, https://www.sramanamitra.com/2018/07/31/turning-philanthropy-into-a-double-bottomline-business-ram-palaniappan-ceo-of-earnin-part-2/

COMPLAINT

### 1.    How the Earnin App Works

20.    Once a user downloads the Earnin app, they are instructed to link their app to the checking account where their paycheck is deposited.

21.    Each Earnin loan begins with a forward from Earnin into the user's checking account. It ends when the user has been paid by direct deposit. At that point, Earnin has collected the funds it had advanced from the user's account, plus any additional funds that were approved by the user. There are no expressly-named "fees" or "interest" charged to the user; instead, Earnin prompts the user to pay a "tip". The suggested amounts range from $9 to $14.[13]

22.    Earnin strongly encourages tipping and, as explained below, punishes users who do not tip. It refers to its customers collectively as a "community," and regularly exhorts this community to provide one another support in the form of tips that will "pay it forward."  It explains that its "venture capital funds go into making our product bigger and better so we can help even more people . . . however . . . we are 95% community-supported and mainly operate on the tips we receive."[14]

### 2.    The Earnin App Collect Substantial Information Regarding Users, Including Bank Account and Location Data

23.    To use Earnin's services, a user must begin by downloading the app from, for example, the Apple AppStore or the Android Play store. Earnin advises potential users that the following are required for use:

1. You are receiving direct deposits regularly into a checking account. The app won't work with Savings or Prepaid accounts.
2. You use an electronic timesheet at work or have a fixed work location. Check out our timesheet requirements article for more info.

---

[13] Earnin, *supra,* at: https://earnin.com/privacyandterms
[14] *Id.* at: https://help.earnin.com/hc/en-us/articles/223329928-How-does-Earnin-make-money-

COMPLAINT

24.   The user must then create a profile. In beginning this step, a potential user is met with the following screen, which touts that users "get paid the minute you leave work **with no loans, fees, or hidden costs.**"[15]



25.   In the account set-up, Earnin then collects the potential user's name, email address, phone number, employment and pay cycle information, bank login information and account/routing numbers, and debit card data.[16]

---

[15] *Id.* at: https://help.earnin.com/hc/en-us/articles/231262648-Step-by-Step-Account-Setup- (emphasis added).

[16] Sage Lazzaro, *This App Promises Easy Cash, But It's a Security Nightmare Waiting to Happen,* OneZero, (Dec 20, 2018), *available at*: https://onezero.medium.com/this-app-promises-easy-cash-but-its-a-security-nightmare-waiting-to-happen-9b5758f91d23

COMPLAINT

26.     After entering their name and other personal information, the potential user must provide paycheck information. The app then initiates the process to link the user's account to their bank. In this step, upon information and belief, Earnin collects information from the user's bank regarding their employment and pay. Earnin also seeks to solicit the user's agreement to monitor their account balance:[17]



27.     In the next step of account set-up, the user confirms his or her employer. The Activehours timekeeping system is the result of several integrations that the company accomplished with various time-and-attendance systems. Among these was a partnership with Uber, whose drivers would provide real-time tests of an algorithm that Palaniappan says allowed Activehours to expand its

[17] Earnin, *supra,* at: https://help.earnin.com/hc/en-us/articles/231262648-Step-by-Step-Account-Setup-

COMPLAINT

service to include not only hourly wage earners but salaried employees as well.[18]   The company also partners with T-Sheets, dedicated timekeeping software created by Intuit/Quickbooks.[19]

28.     The user is then required to confirm their work address and to "always allow" Earnin' to track their location:



29.     Once the account is set up, Earnin verifies bank account and employment information in a few days and sends an email when a user's account is approved. Earnin states, "Once your account has been verified, you can start cashing out when you see your available earnings in the app. If you added your work address during signup, your earnings will be added automatically."[20]

---

[18] Mitra, *supra* at: https://www.sramanamitra.com/2018/08/01/turning-philanthropy-into-a-double-bottomline-business-ram-palaniappan-ceo-of-earnin-part-3/
[19] TSheets by Quickbooks https://www.tsheets.com/app-marketplace/activehours
[20] Earnin, *supra* at: https://help.earnin.com/hc/en-us/articles/213412127-How-do-I-create-an-account-and-how-long-does-it-take-to-get-started-

COMPLAINT

### 3.   The Earnin App Seeks to Extract Tips from Users but Does not Disclose the APR of an Advance or that the Tip Otherwise Constitutes a Cost of Borrowing

30.   Once a user is registered to use the Earnin app, he or she may begin requesting loans, or "Cash Outs" or "Pay Outs," as Earnin calls its lending activities:[21]



31.   With the Earnin app, users are assigned borrowing limits, which are applied to daily and pay-period totals. Upon information and belief, the daily borrowing limit for all users is $100 per day.

32.   Upon information and belief, with respect to pay-period limits, borrowing limits span from $100 per pay period but can rise as high as $500 per pay period. Earnin has previously permitted pay-period borrowing limits as high as $1,000 per pay period. Earnin sets these limits without consideration of state-based limitations on payday loan amounts.

33.   Pay-period borrowing limits can also be reduced; as set forth below, it appears that a primary reason for limit reductions has been the failure to pay a tip.

34.   During the "Cash Out" process, the app solicits users to make a tip. Upon information and belief, Earnin defaults to a tip of $9 on every $100 borrowed.

---

[21] Earnin, *supra*, at https://help.earnin.com/hc/en-us

COMPLAINT

35.     When entering a tip for a loan, Earnin does not disclose to borrowers that the tip is a cost of borrowing or that the amount users may borrow is linked to tipping.

36.     When entering a tip for a loan, Earnin does not disclose to borrowers the tip computed as an APR.

37.     When entering a tip for a loan, Earnin does not disclose to borrowers that the tip is a fee associated with or incident to the borrowing of money from Earnin or that the amount users may borrow is linked to tipping.

38.     In order to avoid the high default tip amount, Earnin app users must manually reset it. Earnin CEO Ram Palaniappan "conceded that customers who don't tip have to manually reset it, which appears to defeat the purpose of the program."[22]

39.     Such tips can result in a high APR. Whether deemed an interest charge or another cost of borrowing, such as a fee, it appears that Earnin has linked the payment of tips to borrowing limits, as detailed below.

**4.     The Balance Shield Loan**

40.     Another service attached to the Earnin app is called Balance Shield, which tracks a user's account balance. Earnin describes Balance Shield as follows:[23]

> By turning on Balance Shield Alerts, customers will be informed via push notification when their bank balance falls below an amount they can specify, ranging from $0-$400. If their bank balance falls below $100, they can also enable Balance Shield Cash Outs, which will preemptively cash out up to $100 of their earnings.

41.     Earnin solicits tips even for the "Balance Shield Alert," which does not advance funds.[24]

---

[22] Kevin Dugan, Popular cash advance app Earnin operating in payday loan 'gray area,' critics claim, New York Post, March 21, 2019, *available at: https://nypost.com/2019/03/21/popular-cash-advance-app-earnin-operating-in-payday-loan-gray-area-critics-claim/.*

[23] Earnin, *supra*, at: https://help.earnin.com/hc/en-us/articles/218516438-Balance-Shield-alerts-and-Balance-Shield-Cashouts.

[24] *Id.*

COMPLAINT

42. With the "Balance Shield Automatic Cash Out," Earnin makes an automatic advance if a user's balance slips below $100. Earnin states: "When you are enrolled in this feature, the app automatically sends up to $100 whenever your bank balance falls below a specific limit."[25]

43. This "Balance Shield Automatic Cash Out" service can only be set up as a recurring feature. Upon information and belief, Earnin has required an automatic tip to be selected by the user. Earnin requires users of Balance Shield to select a "recurring tip amount" that is paid automatically every time Balance Shield makes an automatic cash advance. Earnin's website states:

> When you enroll in Balance Shield, we'll ask you to select a recurring tip amount to pay when Balance Shield is automatically activated. Your Balance Shield preselected tip amount will be prorated based on the amount of money that Balance Shield cashes out. If you set your tip amount to $5 for a $100 cashout, Balance Shield will only take a fraction of that tip amount for cashouts less than $100.

> Keep in mind: when you turn on Balance Shield automatic cashouts, have earnings, and haven't reached your Max, it will cash out for you every time your bank balance drops below $100. You can always go and adjust the settings. [26]

44. Upon information and belief, Earnin has required a fee of at least $1.50 for use of Balance Shield, although it may have altered this policy over time:

> Balance Shield is free for one-time usage. When setting up the feature, Earnin invites you to pay a tip when it's triggered. If you don't set a tip, Balance Shield will protect you only one time. Recurring use of Balance Shield requires a fee of at least $1.50.[27]

45. Other publications have similarly reported that continued tipping was required to obtain Balance Shield loans:

> With Balance Shield, Earnin automatically deposits $100 when your bank balance dips below $100. If you don't tip, this form of overdraft protection turns on only once. To keep this feature going, you need to continue tipping.[28]

[25] *Id.* at: https://help.earnin.com/hc/en-us/articles/360011773593-Why-did-the-app-send-money-to-me-when-I-didn-t-cash-out-

[26] *Id.* at https://help.earnin.com/hc/en-us/articles/218516508-How-much-does-Balance-Shield-Cost-if-the-Cash-Out-is-less-than-100-

[27] nerdwallet.com, https://www.nerdwallet.com/reviews/loans/personal-loans/earnin-personal-loans

[28] Jackie Lam, *Earnin review: Can this app save you from payday loans?,* Policygenius (January 4, 2018), *available at:* https://www.policygenius.com/blog/earnin-app-review/

COMPLAINT

46.    In order to change the default tip for use of the Balance Shield product, a borrower must manually reset the tip amount.

47.    Upon information and belief, borrowing limits are also applied to the Balance Shield loan product. That is, Earnin caps the amount that it will loan a user through the Balance Shield product per pay period, similar to the borrowing limits applied to regular cash advances made through Earnin's standard service.

48.    When entering a pre-selected tip for the Balance Shield loan product, Earnin does not disclose to borrowers that the tip is a cost of borrowing or that the amount users may borrow is linked to tipping.

49.    When entering a pre-selected tip for the Balance Shield loan product, Earnin does not disclose to borrowers the tip computed as an APR.

50.    When entering a pre-selected tip for the Balance Shield loan product, Earnin does not disclose to borrowers that the tip is a fee associated with or incident to the borrowing of money from Earnin or that the amount users may borrow is linked to tipping.

51.    After Earnin makes a loan though the Balance Shield product, Earnin does not disclose to borrowers that the tip is a cost of borrowing.

52.    After Earnin makes a loan though the Balance Shield product, Earnin does not disclose to borrowers the tip computed as an APR.

53.    After Earnin makes a loan though the Balance Shield product, Earnin does not disclose to borrowers that the tip is a fee associated with or incident to the borrowing of money from Earnin.

**5.    Users Incur Fees and Charges Due to the Timing of Earnin's Withdrawals**

54.    The Earnin app revolves around deposits to and withdrawals from users' accounts. The timing of the actions taken and the accuracy of posting information is crucial to the intended outcome of the service. However, inconsistencies in these elements often lead to unsolicited deposits and premature withdrawals, according to many users.[29]

---

[29] Better Business Bureau, https://www.bbb.org/us/ca/palo-alto/profile/mobile-apps/earnin-1216-642613

COMPLAINT

55.     Earnin markets its services as a way for users to avoid bank fees, such as overdraft fees, stating "An unexpected overdraft fee can really hurt. Especially when the next paycheck is days away, and people are charged a fee multiple times and often don't realize until it's too late."[30]



56.     Many users report, however, that Earnin's timing of withdrawals has led to unauthorized charges and insufficient funds fees. In this regard, the Wall Street Journal recites concerns that the app accesses consumers' bank accounts directly, "which could trigger nonsufficient and overdraft fees charged by banks."[31]  That is, Earnin withdraws funds to cover loans even when there are insufficient funds in user accounts.

57.     The National Consumer Law Center noted: [32]

> In contrast, payday advance products, such as Earnin (formerly ActiveHours), appear to be early wage access products but are offered directly to the consumer with no payroll connection and many of the features of payday loans, with purportedly voluntary 'tips' instead of set fees. Advances are repaid automatically through preauthorized bank account debits, without Truth in Lending disclosures, and may lead to overdraft and non-sufficient fund (NSF) fees if the service miscalculates when or how much the consumer will be paid. Consumers may also face unexpected restrictions if purportedly voluntary "tips" are not high enough.

58.     Earnin's advertising does not disclose that overdraft or insufficient funds fees are a potential consequence of using its service.

---

[30] Bindiya Schaefer, https://www.earnin.com/blog/balance-shield-alerts, March 22, 2019.
[31] Yuka Hayashi, *Pay-Access Apps Face Regulatory Test*, Wall Street Journal, Sept. 2, 2019, *available at:*  https://www.wsj.com/articles/pay-access-apps-face-regulatory-test-11567416602
[32] Lauren Saunders, *Fintech and Consumer Protection: A Snapshot*, March 2019, at p.12 (National Consumer Law Center), *available at:*  https://www.nclc.org/images/pdf/cons-protection/rpt-fintech-and-consumer-protection-a-snapshot-march2019.pdf

COMPLAINT

59.     Earnin's advertising conceals that the timing of its withdrawals – which could occur before a paycheck clears – subjects users to the risk of overdraft and NSF fees on Earnin's small dollar loans.  Specifically, Earnin states that it will withdraw payment for loans "[t]he next time your paycheck hits your bank account."

60.     Earnin's advertising rails against fees, without adequately disclosing that users might incur overdraft fees while using their service and due to the timing of Earnin's withdrawal.



61.     Moreover, because the use of Earnin's services increases the risk of overdraft or insufficient funds fees, upon information and belief, users are pressured to enroll in Earnin's Balance Shield service, which as stated above defaults to demand a tip to use more than once. As a result, Earnin can and does improperly trigger the Balance Shield service and obtain a tip from users of this service through the timing of its withdrawals.

62.     Earnin also affirmatively represents that its lending is made without fees, failing to disclose the risk of overdraft charges and insufficient funds fees. Earnin's Terms of Service say:

> **No Fees or Charges.** You are not required to pay any fees or charges to use the Services. There are no fees to obtain a Pay Out, receive a payout for Balance Shield, use Health Aid, or use Earnin Cash Back Rewards. You may make voluntary additional payments in appreciation of the services rendered, but you are not required to pay any charge or fee to be eligible to receive or in return for receiving the Services. These voluntary additional payments help fund Activehours.[33]

63.     Indeed, Earnin's advertising and website are replete with claims that no fees will be incurred in using the service.

---

[33] Earnin, *supra* at Terms of Service § 1, "Overview," https://www.earnin.com/privacyandterms.

COMPLAINT

> Earnin does not charge fees, interest or have any hidden costs to use the app. We depend on our community to support us by tipping what they think is fair when they use the app.

64.     Buried in Earnin's Terms of Service is a disclaimer that Earnin will continue to debit a user's account for the loaned funds, and that Earnin is not responsible for overdraft and NSF fees that a user might incur due to use of the service:

> Activehours is not responsible for any overdraft fees, over-the-limit fees, or insufficient fund charges (including finance charges, late fees, or similar charges) that result from your failure to maintain a balance or available credit in the bank account that is sufficient to fund all payments you initiate.[34]

65.     Earnin's disclosures, which disclaim responsibility for NSF fees and overdraft fees "that a result from your failure to maintain a balance or available credit in the bank account that is sufficient," fail to disclose that the timing of Earnin's withdrawals could result in NSF or overdraft fees.

66.     Earnin's disclosures, moreover, are contradicted by its advertising which promises no fees, including overdraft fees, for use of the service.

67.     When attempting to correct negative events that occur within the app, many users also cite the inability to speak directly with customer service representatives as a continuing complaint.[35] Instead, customers are commonly directed to online scripted chats that are often cut short with the issues unresolved. Emailed messages are also employed as a secondary means of communication with customers.

68.     Palaniappan insists that "Everybody is still very much focused on making the customer better off. We're still very hands-on. We're very close to our customers."[36]  However, the experience of borrowers indicates otherwise.

---

[34] *Id., at* § 9 "Your Use of The Services," https://www.earnin.com/privacyandterms.
[35] Consumer Financial Protection Bureau, FOIA Response, 10/21/2019
[36] Mitra, *supra,* at: https://www.sramanamitra.com/2018/07/30/turning-philanthropy-into-a-double-bottomline-business-ram-palaniappan-ceo-of-earnin-part-1/

COMPLAINT

**B.      Earnin Engages in Illegal Lending Activities and Makes Unsanctioned Payday Loans**

69.      Upon information and belief, although Earnin is licensed to do business in California, it is not licensed with the California Department of Business Oversight as a California Finance Lender. Upon information and belief, furthermore, Earnin is not registered as a California Deferred Deposit Transactions Lender.

70.      Earnin calls its service a "non-recourse liquidity product" and claims that it is neither a payday advance or a loan. Among other claims, Earnin asserts that the only consequence of a user failing to repay an advance is that the user will be barred from using the service in the future.[37]

71.      The financial service provided by Earnin is, in substance, a payday advance or loan.

72.      Regarding Earnin's claim to be a "nonrecourse liquidity product," Adam Levitin, a banking law professor at Georgetown University, commented "That's a mouthful to say: 'We are a loan but we don't want to be regulated as a loan.'"[38]  As another critic of Earnin's practices aptly noted: "To use the word 'tip' instead of a usury charge, an interest rate, or a fee, it's just semantics . . . . It's the same thing at the end of the day."[39]

73.      Lauren Saunders, associate director of the National Consumer Law Center, similarly doubted the characterization of the Earnin service as not being a loan as well as the notion that a "tip" is not a cost of borrowing: "It appears to me they're calling it tips so they don't have to disclose an APR, so they don't have to comply with the Truth in Lending Act . . . . It certainly walks like a duck to me," Saunders said."[40]

**1.      Earnin Links Tips to Lending, Through "Cash Outs" and "Balance Shield Cash Outs"**

74.      The linkage between tips and borrowing limits has been reported by many users,[41] and this is consistent with Plaintiff Stark's experience. As detailed below, Plaintiff Stark saw his borrowing limit change based upon whether he had tipped or not.

---

[37] Quan, *supra* fn. 8.
[38] Farivar, *supra* fn. 7.
[39] *Id.*
[40] Saunders, *supra* fn. 32.
[41] Better Business Bureau, *supra* at: https://www.bbb.org/us/ca/palo-alto/profile/mobile-apps/earnin-1216-642613

COMPLAINT

75.     The linkage between tips and borrowing limits has also been admitted by sources internal to the company. Reporting indicates that the tip-dependent structure was "well known" within the company, as reflected in an internal memo:

> Earnin tells users that their money management practices and the number of coworkers they sign up can influence their max, but it doesn't make it clear that higher tips mean they can take out more money.
>
> But inside the company, the connection was well-known, according to former employees.
>
> "Low tipping users may not understand that their tip rate can prevent them from getting an increase," according to a draft of a September 2018 memo titled "Max Adjustment Tip Messaging Experiments."[42]

76.     The linkage between tipping and borrowing limits, which have been as high as $1,000, is further reflected by the following report:

> It has been widely reported that Earnin' linked user's maximum amount borrowable to tips. In an April 10 Slack message, Melissa Hudson, a high-ranking Earnin executive in charge of development teams, said she was working on a document explaining to regulators that New York users' maximum payouts — which could be as high as $1,000 per pay cycle — weren't tied to how much they "tipped" . . . .
>
> The previous formula, Hudson wrote, "had quite a few tip-related factors," adding that she wanted to make sure those wouldn't be in the document sent to the DFS.
>
> At the time, Earnin was preparing to submit thousands of pages of documents about its business to the state regulators — including those that showed the mathematical formula that determined how much New York users could borrow.
>
> "Can you confirm that there are no other tip related factors going into this tip-independent model that NY users fall into?" Hudson asked, referring to documents to be submitted to DFS, according to Earnin Slack messages.
>
> The switch came so Earnin executives could say "in the present tense" that New York users' maximum payouts weren't affected by how much they paid in fees, according to a former employee who helped gather information for New York regulators. The switch, which has only

---

[42] Kevin Dugan, *Cash-advance app Earnin changes its tune amid NY probe*, New York Post, September 1, 2019, *available at:* https://nypost.com/2019/09/01/cash-advance-app-earnin-changes-its-tune-amid-nys-probe/

COMPLAINT

occurred in NY at this time, was not representative of the company's larger business model, the ex-employee told The Post.[43]

77.    Upon information and belief, Earnin' changed the model for New York users following investigation by New York regulators and subpoena from New York department of Financial Services, served in March 2014:

> Earnin did away with the pay-to-play feature — which handed out as much as 10 times more in loans to users who voluntarily tipped, according to internal documents and a source close to the company — around the time of a March 28 subpoena from the New York Department of Financial Services, according to sources. While the revision was not illegal, according to experts, it raised eyebrows among staffers, a former employee said.
>
> . . .
>
> Regardless of the timing, the switch appeared to have caught some Earnin staffers off guard.
>
> "We moved all NY users into tip independent experiment?" a product manager asked an Earnin risk manager in an early-April Slack message.
>
> "Yes," the risk manager replied.[44]

78.    The same conclusion has been echoed in other publications and news reports, "Since all of the investigations commenced, Earnin recently got rid of its feature that links the size of a loan to voluntary 'tips' in New York." [45]  "But users who don't leave a tip appear to have their credit restricted. And some of the suggested tips equate to a 730% APR — nearly 30 times higher than New York's 25% cap."[46]

---

[43] *Id.*

[44] *Id.*

[45] Hayashi, *supra,* ("Last month, regulators from New York and 10 other states said they were investigating whether some payroll-advance firms violated payday-lending laws.") *See also* Kori Hale, *Nas Investing In Payday Loan App Is Under Scrutiny*, Forbes, Sept. 6, 2019, *available at:* https://www.forbes.com/sites/korihale/2019/09/06/nas-investing-in-payday-loan-vultures-is-under-scrutiny/#6729eec958d6 ("Valued by investors at $800 million, the company is under investigation by at least 11 states and Puerto Rico for evading state usury laws.")

[46] Penny Crosman, *A payday lender in disguise? New York investigates the Earnin app*, American Banker, April 3, 2019, *available at: https://www.americanbanker.com/news/a-payday-lender-in-disguise-new-york-investigates-the-earnin-app*

COMPLAINT

79.     The linkage between tipping and Earnin's willingness to make loans is explicit with the Balance Shield product. By its Balance Shield service, Earnin agrees to make a loan when a user's account balance falls below a specified amount.

80.     For a user to obtain an automatic Balance Shield loan, a pre-selected tip is required. The Balance Shield service can only be set up as a recurring feature, and an automatic tip must be selected by the user.[47]  Earnin's website states: "When you enroll in Balance Shield, we'll ask you to select a recurring tip amount to pay when Balance Shield is automatically activated."[48]

**2.     Earnin's Characterization of its Service as a "Non-Recourse Liquidity Product" Does Not Change the Fact That It Is a Loan**

81.     With the Earnin app, money is advanced and must be repaid. Earnin's business model guarantees the repayment by requiring that all users be salaried, hourly, or on-demand employees who are paid via direct deposit, and that users authorize the company to debit the advanced amount the day the direct deposit is made into the account. As noted above, Earnin uses a GPS tracking system (which it calls "Automagic") to confirm the user's presence at their place of employment during any pay period when a request for a forwarded "Cash Out" has been made.

82.     While Earnin states that it will not initiate legal action to recover sums owed, Earnin's Terms of Service plainly contemplate that it will seek to recoup funds advanced from the authorized account:

> When you request a Pay Out or turn on Balance Shield, you warrant that the earned wages being paid out are just and due to you and that you have not received payment for such wages or any part of the wages from anyone else.
>
> We will recoup payment for Pay Outs or a payout for Balance Shield directly from your bank account upon deposit of your next paycheck. By requesting a Pay Out or turning on Balance Shield, you authorize us to initiate debit and credit entries to your bank account, or if you link a debit card to your account, you authorize us to charge your debit card, for all payments due to us. You agree to maintain a balance that is sufficient to fund all payments you initiate. Activehours reserves the right to charge your bank account at any time on or after the day the paycheck associated with the earned wages you have requested are

---

[47] Earnin, *supra, at:* https://earnin.com/privacyandterms
[48] *Id. at:* https://help.earnin.com/hc/en-us/articles/218516508-How-much-does-Balance-Shield-Cost-if-the-Cash-Out-is-less-than-100-

COMPLAINT

expected to deposit into your account; however, Activehours will attempt to avoid charging your bank account if we believe your bank account does not contain sufficient funds to cover repayment of a Pay Out or payout for Balance Shield in the pay period. Our failure to charge your bank account for repayment of a Pay Out or payout for Balance Shield within a set amount of time does not constitute a waiver of our right to charge your account for such funds. You represent and warrant that you have the right to authorize us to charge your account for payments due to us under these Terms.

. . .

If we are unable to access funds from your bank account to complete a payment that is owed to Activehours, we will have no legal or contractual claim or remedy against you based on your failure to repay, however, you will be prevented from using the Services until you repay any outstanding balance owed to Activehours. Activehours will not engage in any debt collection activities if the payout is not repaid on the scheduled date, place the payout as a debt with or sell it to a third party, or report to a consumer reporting agency concerning the amount of the payout. You further agree that:

- you will reimburse Activehours for any fees imposed on us as a result of the failed transaction; and
- you will reimburse Activehours for any fees we incur in attempting to debit the amount of the failed transaction from you.[49]

83.     Earnin's Terms of Service thus belie its assertion that it is a "non-recourse" product. Earnin explicitly reserves the right to satisfy the amount owed from the specified account. While Earnin states that it will not initiate legal action to recover sums owed, that does not mean that the cash advance is not a loan; only that Earnin contractually agrees to limit the source(s) from which it might seek satisfaction for the debt.

84.     Other clauses in Earnin's Terms of Service likewise indict the notion that Earnin is a not a loan. Specifically, Earnin's Terms of Service require users to certify that they will not seek a "Cash Out" for sums not earned, and reserves the right to Earnin' to seek damages for any violation of this term of service:

---

[49] Terms of Service § 9, "Your Use of the Services," *available at* Terms of Service § 17, "Governing Law & Forum for Disputes," *available at* https://www.earnin.com/privacyandterms.

COMPLAINT

### 3.      No Unlawful or Prohibited Use

As a condition of your use of the Sites and Services, you represent and warrant to Activehours that you will not use the Sites or Services for any purpose that is unlawful or prohibited by these Terms of Service.

You agree that you will not:

request a Pay Out or use Balance Shield for any earned wages that you do not have the complete right, title and interest in or for which you have already received payment;

. . .

If Activehours, in its sole discretion, believes that you may have engaged in any activities restricted by these Terms of Service or by law, we may take various actions to protect Activehours, other users, and other third parties from fees, fines, penalties, and any other liability. The actions we may take include the following:

. . .

we may hold you liable to Activehours for the amount of Activehours's damages caused by your violation of these Terms of Service.[50]

85.    The notion that the service is "nonrecourse" is, in any event, irrelevant to whether the advance is properly characterized as a loan:

Earnin claims it cash advances aren't loans, but "non-recourse transactions," meaning they don't charge interest or give the company the right to collect. However, the IRS can consider non-recourse debt as a loan, even if the lender is unable to personally pursue a borrower in case of default. In the company's terms of service they clearly state that they reserve the right to sue users for violating Earnin's terms of service, which sounds a lot like a form of recourse.[51]

86.    Further, even though Earnin claims that it will not engage in debt collection activities, Earnin reserves to itself the right to change the Terms of Service governing its "Cash Out" advances at any time, meaning that Earnin could effectively nullify its promise that it will not initiate legal action at any time, as follows:[52]

---

[50] *Id.* § 12.

[51] Kori Hale, *Nas Investing In Payday Loan App Is Under Scrutiny*, Forbes, Sept. 6, 2019, *available at:* https://www.forbes.com/sites/korihale/2019/09/06/nas-investing-in-payday-loan-vultures-is-under-scrutiny/#6729eec958d6 ("Valued by investors at $800 million, the company is under investigation by at least 11 states and Puerto Rico for evading state usury laws.")

[52] Earnin, *supra, at:* https://www.earnin.com/privacyandterms#TermsModificationToSiteOrServices2.

COMPLAINT

**Section 2**: "Activehours may modify this Terms of Service from time to time."

**Section 10**: "Activehours reserves the right at any time and from time to time to modify . . . to change the Services and Terms of Service . . . ."

**Section 12**: "Activehours, in its sole discretion, reserves the right to terminate these Terms of Service, access to its Sites, or access to the Services for any reason and at any time with or without notice to you."

87.    Payday loans are illegal in 15 states. Earnin is now under investigation by 11 states and Puerto Rico for violation of predatory lending, payday lending laws, and/or state usury law.[53] In addition to New York, regulators from Connecticut, Illinois, Maryland, New Jersey, North Carolina, North Dakota, Oklahoma, South Carolina, South Dakota and Texas are joining in the investigation.[54]

88.    Upon information and belief, Earnin is not a registered lender or registered payday lender in California or any other jurisdiction.   Earnin's Terms of Service provide, however, that California law applies to Plaintiff's and Class members' claims, as follows: "These Terms of Service, and your relationship with Activehours under these Terms of Service, will be governed by the laws of the State of California without regard to its conflict or choice of laws provisions."

## C.    Plaintiff Jared Stark's Use of the Earnin App

89.    Jared Stark lives in Leavenworth, Kansas.

90.    Plaintiff Stark has used the Earnin app since August 2018. He was initially drawn to Earnin because its marketing and advertising statements present it as an alternative to short-term lenders, of which he was wary.

91.    Plaintiff Stark started using Earnin when his family was going through a period of financial uncertainty. However, his initial use of Earnin began a regular pattern of use, with his monthly limit climbing as high as $400, and a cycle of advances that he has found difficult to escape.

---

[53] Hale, *supra*.

[54] New York Department of Financial Services, *Superintendent of Financial Services Linda A. Lacewell Leads Multistate Investigation of the Payroll Advance Industry*, Aug. 6, 2019, *available at:* https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1908061. *See also* Dan Ennis, 11 states look into the divide among payroll advance companies, Banking Dive, August 8, 2019, *available at: https://www.bankingdive.com/news/nydfs-investigate-earnin-payroll-advance/560534/* .

COMPLAINT

92.     Plaintiff Stark typically tipped between one and five dollars every time he borrowed money through the Earnin app. He used both the basic service, which is provided upon customer request, and the Balance Shield feature. Plaintiff Stark stopped using the Balance Shield feature, which routinely requested a nine-dollar tip, but which Plaintiff Stark lowered.

93.     Plaintiff Stark has seen his borrowing limits fluctuate for no stated reason during his use of the Earnin app. He believes that his limit was affected by the amount that he tipped. For example, his limit was once decreased from $350 to $250 in a single pay period, which followed a week when he had declined to pay a tip.

94.     When Plaintiff Stark used Earnin, Earnin never disclosed to him the true cost of his borrowing and paying "tips," or what those tips would equate to as annual percentage interest rates.

95.     Plaintiff Stark has suffered concrete and particularized financial injury through his use of the Earnin app that this Complaint seeks to redress.

## VII.     CLASS ACTION ALLEGATIONS

96.     This matter is brought by Plaintiff on behalf of himself and those similarly situated, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). The Class that Plaintiff seeks to represent is defined as follows:

> All persons who used the "Earnin" application to obtain an advance of funds (whether through the standard service or Balance Shield service) and paid a tip for use of the service. Excluded from the Class are Activehours d/b/a Earnin's officers, directors and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

97.     **Numerosity**: The members of the Class are so numerous that joinder of all members would be impractical. Earnin reportedly has millions of users. The precise numbers of members can be ascertained through discovery, including of Earnin's records.

98.     **Commonality and Predominance**: Common questions of law and fact predominate over any questions affecting only individual members of the Class. For Plaintiff and the Class, the common legal and factual questions include, but are not limited to the following:

A.     Whether Earnin has engaged in unfair, fraudulent, or illegal acts and practices, including but not limited to practices relating to its advertising and claims with respect

COMPLAINT

to "tips," interest, and fees charged for use of its service; misrepresenting the nature of tips or the required tips for use of the "Balance Shield" loan service;

B.   Whether Earnin improperly deducted repayment for loans prior to Plaintiff's and Class Member's authorizations, resulting in insufficient funds and/or overdraft fees;

C.   Whether Earnin has failed to disclose the cost of borrowing, fees and/or APR associated with the use of its product;

D.   Whether Earnin has violated federal lending laws;

E.   Whether Earnin has engaged in illegal lending, including for failure to properly register pursuant to California's Financing Law and/or California's Deferred Deposit Transaction Law;

F.   Whether Earnin has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices with its financial products;

G.   Whether Earnin has charged usurious interest or fees in connection with its financial products;

H.   Whether Earnin has breached its contracts with Plaintiff and the Class Members;

I.   Whether Earnin linked borrowing to the payment of a "tip";

J.   Whether Earnin linked use of the "Balance Shield" loan service to the payment of a tip;

K.   Whether Earnin's advance of funds is properly characterized as a loan and/or deferred deposit transaction;

L.   Whether, because of Earnin's conduct, Plaintiff and the Class have suffered damages and, if so, the appropriate amount thereof; and

M.   Whether, because of Earnin's misconduct, Plaintiff and the Class are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

99.   **Typicality**: The representative Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all the members of the Class have been injured by the same wrongful practices of Earnin. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

COMPLAINT

100.   **Adequacy**: Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class, and has retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiff nor his attorneys have any interests contrary to or in conflict with the Class.

101.   **Predominance and Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

102.   Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Earnin has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

103.   Any difficulties in the management of this nationwide class will be minimal because California law will apply to all Class members' claims, according to Earnin's Terms of Service.

104.   Earnin has, or has access to, address and/or other contact information for the members of the Class, which may be used to provide notice of the pendency of this action.

COMPLAINT

## VIII.   CAUSES OF ACTION

### COUNT ONE — CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF CODE § 17200, *ET SEQ.* ("UCL")

105.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

106.    Plaintiff Stark brings this claim on his own behalf and on behalf of the nationwide Class.

107.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendant has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

108.    Plaintiff Stark and Defendant are "persons" within the meaning of California Business and Professions Code § 17200.

109.    Plaintiff has standing to assert a UCL claim because Defendant does extensive business in California, its principal offices are in California, many Class members are in California, and Defendant's decisions and advertising regarding the claims in this case were made in and emanate from California. For example, upon information and belief, Defendant's misrepresentations and omissions through advertisements and social media, as well as its advertising and social media strategy, were developed, designed, implemented, and emanated from Defendant's principal place of business in California. Upon information and belief, the Earnin app was developed in California. California therefore has a substantial interest in the application of its law to the conduct alleged herein.

110.    In addition, Defendant's Terms of Service provide that California law applies to Plaintiff's and Class members' claims. In addition to the Terms of Service set forth above, Earnin's Terms of Service state, as relevant here, the following:

> These Terms of Service, and your relationship with Activehours under these Terms of Service, will be governed by the laws of the State of California without regard to its conflict or choice of laws provisions.[55]

111.    In the course of trade and commerce, Defendant participated in unfair, deceptive, and/or unlawful acts in violation of California Business and Professions Code § 17200 by misrepresenting

and/or omitting material facts concerning the Earnin service; making misleading statements or omissions regarding the Earnin app, including its basic and Balance Shield products; engaging in unlawful lending practices; engaging in unfair business practices, including unfair lending; and making unconscionable loans and/or advancing money pursuant to unfair, illegal or unconscionable terms.

112.    As alleged herein, Defendant violated California Business and Professions Code § 17200 by misrepresenting by omission material facts concerning the Earnin service; attempting to bypass unfair lending laws designed to protect consumers; and making unconscionable loans.

113.    Those practices are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. For example, to attempt to skirt payday lending laws, Earnin prohibits any public posts from its customers that include the words "payday loan," "cash advance," or "loan":[56]

> **Phrases To Avoid:** *Seriously, we can't consider your entry if you say:
> ✗ "Payday Loan"
> ✗ "Cash advance"
> ✗ "Get paid early"
> ✗ "Loan"

114.    Earnin's practices are fraudulent because Earnin misrepresented by omission the true cost of lending and because it failed to disclose the equivalent APRs for its tips or that a borrower's borrowing limit was tied to tipping, deceiving Plaintiff and the class.

115.    Those practices are unlawful because they are unlawful attempts to bypass state or federal lending laws, including the laws cited in this Complaint.

116.    Earnin's acts are also unlawful under the UCL because they violate the California Financing Law, Cal. Fin. Code §§ 22100 *et seq*. Earnin violations that state law because its transactions—whether called a "Cash Out," cash advance, or "Non-Recourse Liquidity Product" —are

---

[56] https://www.earnin.com/people-of-earnin

in substance consumer loans under Cal. Fin. Code § 22103, and Earnin is engaged in the business of consumer finance lending without obtaining a license from the California Department of Business Oversight. Cal. Fin. Code § 22100(a). Moreover, Earnin makes those unauthorized consumer loans by charging "tips" that exceed the statutory maximums proscribed by the California Finance Lending Law.

117.    Defendant knew or should have known that its conduct violated California Business and Professions Code § 17200. Defendant owed an ongoing duty to refrain from unfair, deceptive, and/or unlawful acts or practices.

118.    Defendant's unfair, deceptive and/or unlawful acts or practices are ongoing and present a continuing risk to consumers and the Nationwide Class as well as the general public.

119.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

120.    Plaintiff Stark and the Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's unfair, deceptive, and/or unlawful acts or practices. Those adverse consequences or losses, including the loss of money, were foreseeable results of Defendant's misrepresentations, concealment, and suppression of material facts. As a direct and proximate result of Defendant's violations of the California Business and Professions Code § 17200, therefore, Plaintiff and the Class have suffered injury-in-fact and actual damage.

121.    Pursuant to California Business and Professions Code § 17200, Plaintiff Stark requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to the Class Members any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

122.    To the extent Plaintiff seeks equitable relief under this Count, he does so in the alternative to the legal remedies he seeks or because he has no other adequate remedy at law.

COMPLAINT

**COUNT TWO — TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *ET SEQ.***

123.     Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

124.     Plaintiff Stark brings this claim on his own behalf and on behalf of the nationwide class.

125.     Congress passed the Truth in Lending Act ("TILA") to ensure consumer borrowers understood the true cost of consumer credit.

126.     As one way to accomplish that goal, TILA requires creditors to clearly and conspicuously disclose to borrowers the accurate and full terms of the legal relationship between creditors and consumer borrowers, including Plaintiff and Class Members.

127.     Earnin is a creditor subject to TILA, as a business that offers or extends credit to consumers, on a regular basis, subject to a finance charge, and primarily for personal, family or household purposes, pursuant to 12 CFR 1026.1(c)(1).

128.     A tip is a finance charge pursuant to 12 CFR 1026.4(a) as a "charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."

129.     Earnin's loans constitute closed-end credit subject to the disclosure requirements of 12 CFR 1026.17. Further, pursuant to 12 CFR 1026.18, regarding the content of disclosures for closed-end credit, creditors must disclose, *inter alia*, the creditor, amount financed, itemization of amount financed, finance charge, and APR. Earnin makes no disclosures pursuant to 12 CFR 1026.17-18.

130.     Plaintiff and the Class have been injured and have suffered monetary losses because of Earnin's violations of TILA.

131.     Plaintiff and the Class are therefore entitled to recover actual and/or statutory damages and attorneys' fees and costs from Earnin, as provided by 15 U.S.C. § 1640(a).

**COUNT THREE — CALIFORNIA DEFERRED DEPOSIT TRANSACTIONS LAW**

132.     Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

133.     Plaintiff Stark brings this claim on his own behalf and on behalf of the nationwide class.

COMPLAINT

134.     Pursuant to the California Deferred Deposit Transactions Law, Cal. Fin. Code § 23005(a) ("CDDTL"),  "(a) A person shall not offer, originate, or make a deferred deposit transaction, arrange a deferred deposit transaction for a deferred deposit originator, act as an agent for a deferred deposit originator, or assist a deferred deposit originator in the origination of a deferred deposit transaction without first obtaining a license from the commissioner and complying with the provisions of this division."

135.     According to the agency that administers the CDDTL, "A deferred deposit transaction is commonly known as a payday loan."[57] Electronic disbursements are a large and growing share of the payday loan business. While Earnin' attempts to distinguish itself from payday lenders, its website says it offers "payday advances":

**The Next Big Thing You Missed: Startup Offers Payday Advances Without The Pesky Loan-sharking**

136.      Earnin therefore provides, in substance, deferred deposit transactions to Plaintiff and Class members.

137.     Upon information and belief, Earnin has not obtained the required license from the California Department of Business Oversight to engaged in deferred deposit transactions, and Earnin provides payday loans that do not comply with the CDDTL's requirements.

138.     Earnin's violation of the CDDTL injures Plaintiff and Class members because Earnin provides loans to Plaintiff and Class members without the consumer protections provided by the CDDTL.

139.     Under the CDDTL, Plaintiff and Class members are therefore aggrieved consumers entitled to damages, equitable relief, treble damages, attorney's fees and costs. Cal. Fin. Code § 23064.

140.     Because Earnin's violations of the CDDTL are willful, Plaintiff and Class members are also entitled to punitive damages. Cal. Fin. Code § 23064.

---

[57] https://dbo.ca.gov/payday-lenders-cddtl/

COMPLAINT

## COUNT FOUR — BREACH OF CONTRACT

141.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

142.    Plaintiff Stark brings this claim on his own behalf and on behalf of the nationwide Class.

143.    Earnin's Terms of Service are a contract between Plaintiff and Class members and Earnin. Those Terms state, in pertinent part:

> **No Fees or Charges.** You are not required to pay any fees or charges to use the Services. There are no fees to obtain a Pay Out, receive a payout for Balance Shield, use Health Aid, or use Earnin Cash Back Rewards. You may make voluntary additional payments in appreciation of the services rendered, but you are not required to pay any charge or fee to be eligible to receive or in return for receiving the Services. These voluntary additional payments help fund Activehours.

144.    Upon information and belief, Earnin breached these provisions of its Contract with Plaintiff and the Class by making a borrower's eligibility to receive services, including the amount of money that a borrower is eligible to receive as a Pay Out, contingent upon a borrower's tipping history.

145.    Upon information and belief, Earnin has also breached these provisions of its Contract with Plaintiff and the Class by requiring payment of fees or charges to use services, including requiring payment of fees or charges to use of the Balance Shield Service.

146.    Plaintiff and the Class have been harmed and have suffered damages as a result of Earnin's breach of its contractual obligations to Plaintiff and the Class. These damages include, but are not limited to, the amount of tips, fees, and charges paid by Plaintiff and the Class to Earnin.

## COUNT FIVE — BREACH OF THE COVENANT OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

147.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

148.    Plaintiff Stark brings this claim on his own behalf and on behalf of the nationwide Class.

COMPLAINT

149.     Under California law, there is in every contract or agreement an implied covenant of good faith and fair dealing. This obligation is read into contracts and functions as a supplement to the express contractual covenants, in order to prevent a transgressing party from engaging in conduct that, while not technically transgressing the express covenants, frustrates the other party's rights to the benefit of the contract. As such, neither party may engage in conduct that impairs or prevents the other party from enjoying the benefits of the contract or engage in conduct that prevents the other party from performing under the contract.

150.     As set forth above, Plaintiff Stark and Earnin mutually assented to, and therefore were bound by, a Contract. This Contract contains an implied covenant of good faith and fair dealing.

151.     Earnin's Contract with Plaintiff and the Class states, in pertinent part, that its Balance Shield service "allows you to access earned wages prior to payday in order to help you minimize overdrafts by automatically sending you a payout between $.01 and $100 every time we see that your bank account balance has fallen below $100." Similarly, Earnin markets its services as a way for users to avoid overdraft fees.

152.     Earnin breached the implied covenant of good faith and fair dealing by frustrating and interfering with the right and ability of Plaintiff and the Class to enjoy the benefit of the Contract by, among other things, making withdrawals from borrowers' accounts that resulted in account overdrafts and insufficient funds fees.

153.     Earnin also breached the implied covenant of good faith and fair dealing by concealing and failing to inform borrowers that the tips paid by Plaintiff and the Class to Earnin usually equate to a very high interest annual percentage rate ("APR")—up to an APR in excess of 700%.

154.     Plaintiff Stark and the Class members have been harmed and have suffered damages as a result of Earnin's breach of the implied covenant of good faith and fair dealing. These damages include, but are not limited to, insufficient funds fees caused by Earnin, as well as the tips paid by Plaintiff and the Class to Earnin.

COMPLAINT

## IX.    REQUEST FOR RELIEF

155.    Plaintiff, individually and on behalf of all others similarly situated, requests that the Court enter judgment against Defendant, as follows:

A.    Certify the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appoint Plaintiff as representative of the Class and appoint the lawyers and law firm representing Plaintiff as counsel for the Class;

B.    Award declaratory relief, including but not limited to a declaration that Earnin's actions and business practices are unlawful and that Earnin must comply with state and federal lending laws;

C.    Award injunctive relief, including injunctive relief permanently enjoining Earnin from performing further unfair and unlawful acts as alleged;

D.    Award all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class, including disgorgement, penalties, unjust enrichment, and all other relief allowed under applicable law;

E.    Grant Plaintiff and the Class awards of restitution and/or disgorgement of Earnin's profits from its unfair and unlawful practices described above;

F.    Award all costs of prosecuting this action, including attorneys' fees and expert fees as may be allowable under applicable law;

G.    Award both pre-judgment and post-judgment interest on any amounts awarded;

H.    Award treble damages insofar as they are allowed by applicable laws;

I.    Award appropriate individual relief as requested above;

J.    Grant such other and further relief, including declaratory, injunctive, and equitable relief, as the Court may deem proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

COMPLAINT

1    DATED this 15th day of November, 2019.

2                              KELLER ROHRBACK L.L.P.

3

4                              By s/ Matthew J. Preusch
5                                   Alison E. Chase (SBN 226976)
                                    Matthew J. Preusch (SBN 298144)
6                                   Christopher L. Springer (SBN 291180)
                                    801 Garden Street, Suite 301
7                                   Santa Barbara, CA 93101
                                    Telephone (805) 456-1496
8                                   Fax (805) 456-1497
                                    achase@kellerrohrback.com
9                                   mpreusch@kellerrohrback.com
10                                  cspringer@kellerrohrback.com

11                                  *Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT